IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

---

MELISSA HARMAN and
JUSTIN OVERTON,
                Plaintiffs,

vs.

BRENT POLLOCK, *et al.*
                Defendants.

Case No. 2:03CV00558TC

Judge Dale A. Kimball

Report of Kenneth R. Wallentine

---

The following report of Kenneth R. Wallentine is submitted after review of the following

documents, pleadings, records, and reports: Plaintiffs' Complaint and Defendants' Answers;

Defendants' Rule 56 motion: Defendants' Motion for Summary Judgment; photographs and

diagrams and drawings represented to depict the incident scene; original and supplemental police

reports; depositions transcripts and associated exhibits (numbers 2 through 40 inclusive) of Jess

Anderson, Scott Barnett (2004, 2006), Kathryn Bernards-Goodman, Vu Bowers, Kirk

Christensen, Daniel Fuhr (2004, 2006), Joseph Gomez, Daniel Huber, Tyler Kotter, Todd

Leiendecker, Donavan Lucas, Edward Michaud, Garrard Moren, Brent Pollock (2004, 2006),

Cori Start, Avieni Taufa (2004, 2006), James Webb, Jeffrey Chugg, Ken Purdy, Melissa Harman,

and Jason Overton; the report and supplemental report of Paul Masuyama; policies and

procedures of the Utah Department of Public Safety State Bureau of Investigation, Special

Emergency Response Team and the Utah Highway Patrol; and documents numbered 1 through 254, inclusive.

Kenneth R. Wallentine states as follows:

1.    I am a law enforcement officer in the State of Utah. My primary employment is for the Utah Attorney General, where I serve as Chief of Law Enforcement. I was formerly employed as Investigations Bureau Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division, where I supervised investigations into allegations of improper and excessive force, officer integrity, and criminal acts alleged to have been committed by law enforcement officers. I was certified as a law enforcement officer in the State of Utah in 1982. My present duties include direct command of four Investigation Sections, supervising sworn law enforcement officers, forensic specialists, civilian economist, accountants, attorneys and technicians. I have written, supervised, and/or served over one hundred and twenty-five state and federal search warrants and participated in the review of many more, authorizing search warrants for a variety of evidence, including ancient human mummies and skeletons, rare South American wildlife skins, controlled substances of various kinds ranging in quantity from a few grams to hundreds of tons, dinosaur bones, illegal weapons, countless thousands of business records, nationwide pharmacy billing and inventory records, and other various items.

2.    I was formerly responsible for providing instruction of the Basic Training Curriculum related to most legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy. I continue to teach at the Utah Law Enforcement Academy on a regular basis, as well as occasionally at other police academies and criminal justice programs throughout the State of Utah. I am the author of the police academy curriculum currently in use at all Utah law

enforcement academies for several subjects, including, but not limited to, constitutional law, laws of arrest and detention, use of force, reasonable force, use of force and police service dog teams, search and seizure, search and seizure for police service dog teams, and use of force/firearms instructor liability. In addition to the Basic Training Program, I regularly teach in the following specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy, Internal Affairs, Utah Crime Scene Investigators Academy, Utah POST Command College, First Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler Course, POST Narcotics Detector Dog Course, and others.

3.      I am a licensed attorney, having practiced law on at least a part time basis since 1990. I am admitted to practice before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits, and the State and Federal courts in the State of Utah. I am a Master of the Bench of the American Inns of Court, Inn One, where I also serve as President of the Inn of Court. I serve as an Administrative Law Judge for the State of Utah, providing hearing officer and appellate hearing services for hearings involving allegations of police officer misconduct for a variety of state agencies and municipalities. I serve as an Administrative Law Judge for some county and municipality public safety Civil Service Commissions in the State of Utah.

4.      In addition to my primary employment, I occasionally consult and provide expert witness opinions on police procedures, and use of force issues. I am a member of the adjunct faculty of Excelsior College in Albany, New York, teaching Criminal Procedure and Management Strategies for Public Safety. In cooperation with DeLand and Associates, I provide law enforcement continuing education services, writing course curriculum and preparing examinations on the topics of search and seizure, police officer discipline, and the investigation

of sudden in-custody death and officer-involved fatalities. I provide law enforcement academy curriculum consulting and accreditation review services for the United States Department of Justice. In the recent past, I have provided such services to the Texas Department of Public Safety on two occasions and to the Las Vegas Metro Police Department on two occasions. I occasionally perform in-custody death investigations and officer-involved shooting death investigations for agencies which may lack the requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring and screening practices, use of force, and police pursuit policies.

5.     I participate and serve in a number of community and professional capacities. I am an accredited member of the Scientific Working Group on Dog and Orthogonal Factors, a national scientific standards organization chartered and coordinated by the Federal Bureau of Investigation with research coordinated by the International Forensic Research Institute at Florida International University. Other professional activities pertinent to law enforcement include serving as a Board Member and Past-President of the Utah Peace Officers Association, Board Member of the Utah SWAT Association, member of the American Society of Law Enforcement Trainers, member of the International Association of Law Enforcement Educators and Trainers Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the United States Police Canine Association, and Chairman of the Utah Law Enforcement Legislative Committee. I

formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training.

6.     Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. In the past few years, I have restricted my travel outside the State of Utah, but have continued to provide use of force, civil rights liability, and search and seizure law enforcement training in Arizona and California. Over the past several years, I have lectured and trained police officers and administrators from Wyoming, Arizona, Connecticut, Iowa, Florida, North Carolina, South Carolina, Texas, Utah, Colorado, Alabama, Louisiana, Nevada, New York, New Hampshire, Vermont, Rhode Island, Maine, Delaware, Wisconsin, Michigan, Indiana, Washington, Oregon, Nebraska, Georgia, California, Nevada, and Idaho.

7.     I have previously published a number of other professional articles, many of which have been subjected to peer review. In the spring of 2006, I was solicited by the American Bar Association to write a book addressing pre-trial criminal procedure. This book, *Street Legal: A Guide for Police, Prosecutors & Defenders*, has been recently completed and is in production. It was extensively peer-reviewed by prosecutors, criminal defense attorneys and civil rights attorneys, and will be imminently published by the American Bar Association. It is a treatise on public safety and criminal procedure, with extensive discussion of the Fourth Amendment warrant clause and the various exceptions to the warrant clause. My previous published works (limited to the past ten years) include: *K9 Court Testimony*, Police K9, December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections Managers Report, October

2006; *Preemptive Deadly Force: Israeli Response to Suicide Bombers and American Jurisprudence*, (in process) abstract accepted by the IADLEST Conference; *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*, Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk Management*, The Municipal Lawyer, July 2002; *The New Paradigm of Firearms Training*, IADLEST News, Spring 2001; *Use of Deadly Force Instructor Curriculum* (monograph), POST, Spring 2001; *Pepper Spray as Use of Force*, Police, October 2000; *Are Drug Courts the Wave of the Future?*, Police, April 2000; *Legal Risks of Tactical Operation*, Police, April 1999; *Dogs of War (K9 Use of Force)/FLSA & K9 Handlers*, Police, December 1998/January 1999; *No-knock & Nighttime Searches*, Police, September 1998; *The Respectable Roadblock Ruse*, Police, June 1998; *If at First You Don't Succeed . . .*, Clark Memorandum, Fall 1998; *Preparing and Executing Search Warrants* (UPOA 1998); *Taking a Real Bite Out of Crime: Successful Risk Management for K9 Programs*, Utah Peace Officer, Summer 1996. I am the author of a reference book currently in use in the Utah Law Enforcement Academy, as well as other police academies and criminal investigation specialty courses throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, and preparation and execution of search warrants among other subjects.

8.     I charge a fee for private consultation services and court testimony. For those matters which progress beyond an initial brief consultation, I charge $125.00 per hour for all activities

outside of court testimony, a travel fee of $500.00 per day, plus actual expenses, for travel to western states, and $250.00 per hour when offering testimony. I have testified and/or provided depositions in the following cases which are generally related to the subject of the instant litigation in the past four years: *Frank v. City of Phoenix, Koliboski v. City of Mesa, Walker v. Orem Department of Public Safety*, and *Thomson v. Salt Lake County*.

9.      In the instant matter, I have relied upon the documents, photographs, pleadings, records, reports, depositions, and statements previously described. I have formed a number of opinions based upon the aforementioned, as well as my experience, education, and familiarity with professional publications. I have relied on a variety of professional publications, including, but not limited to: *Deadly Force: What We Know*, Police Executive Research Foundation; *Effective Police Supervision*, More, Wegener & Miller; *Deadly Force Encounters*, Dr. Alexis Artwohl; *Critical Issues in Police Liability*, Victor Kappeler; *Analyzing Criminal Behavior*, Greg Cooper and Mike King; *Total Survival*, Ed Nowicki; *Street Survival*, Adams, McTernan & Remsberg; *The Tactical Edge*, Chas. Remsberg; *Tactics for Criminal Patrol*, Chas. Remsberg; *Justice Administration*, Kenneth Peak; *Current Legal Issues in Criminal Justice*, Craig Hemmens; *Contemporary Policing*, Quint Thurman & Jihong Zhao; *Criminal Procedure*, Jerold Israel & Wayne LaFave; *Human Dignity and the Police*, Gerald Lynch; *Understanding Police Culture*, John Crank; *Criminal Law*, Wayne LaFave; *Criminal Procedure*, Wayne LaFave; *The Fourth Amendment Handbook*, William W. Greenhalgh; *The Constitution and Criminal Procedure*, Akhil Amar; *Procedures in the Criminal Justice System*, Gilbert Stuckey, Cliff Roberson & Harvey Wallace; *Criminal Justice*, James Inciardi; *Criminal Investigation*, Wayne Bennett & Karen Hess; *Criminal Procedure*, Joel Samaha; *Criminal Investigation*, Michael Lyman; *Police*

*Management*, Roy Roberg, Jack Kuykenall & Kenneth Novak; *Criminal Procedure*, John Scheb & John Scheb II; *Criminal Law*, Thomas Gardner & Terry Anderson; *Criminal Procedure for the Criminal Justice Professional*, John Ferdico; *American Criminal Law*, John Scheb & John Scheb II; *Constitutional Law for the Criminal Justice Professional*, Scott Harr & Karen Hess; *Criminal Law*, Joel Samaha; *Crime and Justice*, Howard Abadinsky & Thomas Winfree; *Criminal Law and Procedure*, John Scheb & John Scheb II; a variety of law enforcement journals, such as *Police, Police Chief, Law and Order*; as well as a collection of hundreds of trial and appellate court memoranda, briefs, and opinions collected by me over the past two decades; my own publications and research for those publications; and my general familiarity with the policies and procedures of various component units of the Utah Department of Public Safety. I further relied upon materials cited by plaintiff's expert report, including: *California Peace Officers Sourcebook*, California Atty. General; *California Commission on Peace Officer Standards and Training, Learning Domain Sixteen, Search and Seizure*. My opinions, and a summary of the circumstances known or reported to me upon which those opinions are based, are set forth herein as follows:

a. Alerted to narcotics trafficking allegedly committed by residents of 44 West 2700 South, South Salt Lake City, Utah, agents of the Utah Department of Public Safety ("DPS"), State Bureau of Investigation ("SBI") launched an investigation.

b. A district court judge reviewed SBI Agent Pollock's affidavit in application of a search warrant and found that there was probable cause to search for controlled substances. On February 4, 2003, the judge issued an order to search the premises at 44 West 2700 South, including "any and all outbuildings and curtilage of the property" and authorized warrant

execution without providing prior notice to building occupants. SBI agents performed a standard warrant service risk assessment and decided to request the assistance of the DPS Special Emergency Response Team ("SERT") to serve the search warrant.

c.  On February 12, 2003, members of the DPS SERT team and the Department of Corrections ("DOC") Special Weapons and Tactics ("SWAT") team executed "no-knock" entry into buildings located at 44 West 2700 South and secured the area for searching by SBI agents. Plaintiffs were lying on a mattress on the floor in the building at the rear of the property, a combination of storage garage and nonconforming (according to local planning and zoning laws and records) dwelling. Plaintiffs were detained during the execution of the search warrant. Marijuana and drug paraphernalia were in open view and the odor of marijuana permeated the dwelling space. Plaintiffs each received a citation in lieu of custodial arrest for the crime of illegal possession of marijuana and illegal possession of drug paraphernalia.

d.  Much has been said about the lawfulness of the search warrant issued by Judge Peuler and the matter has been addressed in an opinion of the Tenth Circuit Court of Appeals. Hindsight proves that plaintiffs resided in a separate dwelling integrated into the detached garage on the premises of 44 West 2700 South. As consistently and frequently noted by the United State Supreme Court, the clarity of hindsight is not the appropriate lens with which to view police action. Once agents determined that 44 West 2700 South was a base of operations for illegal drug dealers and established probable cause that illegal drugs were held there, the process used by defendants for identifying the likely residents and verifying the extent of the buildings on the small lot as an integrated unit comported

with general police practices and was objectively reasonable. A reasonable officer would rely on the information collected from the various sources to conclude that the property at 44 West 2700 South was a single residential property.

e. Agent Pollock identified "Isabell" as an illegal drug dealer and identified her probable residence as 44 West 2700 South. He asked an SBI analyst, Joe Gomez, to research subscription databases and certain records made available to law enforcement to more specifically identify the putative residents of 44 West 2700 South. Analysts have become a common feature in larger law enforcement agencies and investigative groups in the past decade, particularly in narcotics investigation units which may be supported by National Guard resources. Gomez performed a number of routine checks that are generally designed to identify the residents at a particular location. These checks must be performed judiciously, and examination of public records and non-protected private records should be limited to sources that are not likely to compromise the investigation and safety of the investigating officers through intentional or negligent disclosure of the investigation or inquiry. *See* Gomez Depo. p. 70. Gomez compared the name of the property owner of record with the name(s) of residents to identify a possible rental property. It appeared that the 44 West 2700 South property was a rental property. Rental properties often present unique and frustrating challenges in identifying the residents through surreptitious record examination. In some rentals, tenants change frequently. Moreover, the utility services may often be provided as a condition of rent and the applicable contracts and accounts listed in the name of the non-resident owner, a property management company, or an individual with no connection to the property whatsoever,

other than as an agent of the owner or property manager. As a safety precaution, officers should presume that anyone with a connection to the property might actually be found at the property when the warrant is executed.

f.  Gomez also checked with the security department at Questar, the regional provider of natural gas, and discovered that the sole gas account at 44 West 2700 South was in the name of Melissa Harman. Gomez performed a number of other checks using Harman's name. It is not at all unexpected that Harman's name did not match or relate to "Isabell." Illegal drug dealers frequently reside at places that have a highly transient occupancy. Whether occupants friends or roommates or illegal drug associates of the owner or renter, the duration, identity and number of house occupants in such dwellings is often unpredictable and highly dynamic. Harman's name on the gas utility account for 44 West 2700 South, particularly when she was not listed as the property owner, is highly suggestive that she was the resident at 44 West 2700 South. Gomez found through Salt Lake County Recorder records that the property at 44 West 2700 South was listed as a single family dwelling. Nothing in these routine checks would normally alert a reasonable investigator that there may be an additional dwelling behind 44 West 2700 South.

g.  Based on the information gleaned from Mr. Gomez, Agent Pollock drafted an affidavit for a search warrant. The focus of the affidavit was to find illegal drugs possessed at 44 West 2700 South. A standard exercise using a risk management matrix suggested warrant entry by a specially trained team of operators. SBI typically calls upon SERT in such cases and that was the decision in this case. As a matter of routine, SERT sends its

own operators to scout the place to be searched. In this case, the operators saw the garage with the addition that raised the question of a separate dwelling and reported that information to Pollock. Pollock did that which a reasonable officer would be expected to do and discussed it with his supervisor (Barnett), Gomez, and a Deputy District Attorney. The consensus was that a single warrant was indicated based on the information discovered through a reasonable investigation. Because of the reliability of the information gathered from Data Services Company and Questar (coupled with the fact that a single gas account is highly suggestive of a single dwelling, whether comprised of unconnected structures or not) a reasonable officer would have believed that there was a single dwelling at 44 West 2700 South. Data Services Company is one of a variety of subscription-based information providers relied upon by law enforcement investigators. I subscribe to several such services for my own department, including a successor company to Data Services Company. A reasonable officer would rely on this information, and the decision by Judge Peuler to issue an order to search, and a reasonable officer would execute the search as ordered by the District Court.

h.  To properly understand the execution of the search warrant it is necessary to distinguish the two major component responsibilities of warrant entry and securing and the actual search and ancillary investigative tasks. The division of labor between SBI and SERT is typical of many law enforcement organizations. Though there is necessarily some coordination of scheduling, the SERT team generally operates independently of the investigative team. SERT is responsible to scout the physical location and create the safest possible operation plan for entry and securing the target location, entering,

stabilizing the scene, providing any necessary first aid, preventing the destruction or concealment of evidence, detaining and securing persons at the scene, documenting the entry and any associated personal or property casualty information, centrally locating suspects, and finally releasing the suspects to the investigative element for whatever interviews and/or arrests may be appropriate. Once the SERT team has completed its responsibilities, the investigative team (SBI in this case) immediately steps in to accomplish the actual search, as well as to sort out the persons who are at the scene and assess their knowledge of the illegal drug activity that prompted the warrant and/or their involvement in the drug crimes or other crimes that may be discovered during the warrant execution process.

i.  The February 12, 2003, search warrant entry to the buildings at 44 West 2700 South, including the garage and dwelling outbuilding occupied by plaintiffs, was effected in a reasonable manner, consistent with policies and practices designed to maximize safety to officers and occupants and minimize the use of physical force. The SERT Operation Order details a well-considered entry and containment plan. Reasonably predictable contingencies are considered. The intended force to enter is restrained and mitigated by the possible presence of children in the buildings. Medical assistance is planned. In short, it is a reasonable plan consistent with best practices of special operations units.

j.  Officers entered the premises of the main dwelling and the garage and non-conforming dwelling occupied by plaintiffs in good faith reliance on a valid warrant. The officers believed that these two buildings comprised a single family dwelling. Once officers began to search the premises, a question eventually arose about the connection, or lack of

connection, between the main dwelling and the garage dwelling and the persons who were present in each building. The plaintiffs do not share the ethnicity of the suspects nicknamed Pawoo and Isabell, there was a narrow physical separation of the buildings, and plaintiffs disclaimed any knowledge of the drug dealing by Pawoo and Isabell.

k.  No conclusive time line has been provided to me. However, some times are accurately discernable. It appears that the initial entry and securing of the premises began at 0045 and took approximately twenty minutes. Following the initial entry and securing by SERT officers, nearby SBI agents were summoned to search for the contraband named in the search warrant. SERT officers were delayed in completing their tasks by the need to carefully protect and secure children and turn them over to a child protection worker from the Division of Child and Family Services. When the SERT officers were ready to transfer authority over the scene to SBI agents, plaintiffs were moved from the residence to a van to await interviews with investigators. Plaintiffs were interviewed by officers and issued a citation in lieu of arrest and booking at 0236, or slightly less than two hours following entry. The on-scene tasks incident to the search warrant execution were concluded and all officers ready to depart by approximately 0330. Barnett Depo. 2006 p. 33.

l.  Following the precedent established in *Michigan v. Summers*, 452 U.S. 692 (1981), officers are trained that the residents of premises searched pursuant to a search warrant for contraband can and should generally be detained during the full duration of the search process. This is particularly true when controlled substances are the contraband named in the search warrant. Not only may controlled substances be easily destroyed or concealed,

but modern experience and training teaches that illegal drug dealers may well be armed. Though detention of residents may be a topic for advanced investigation training, many police academy curricula have integrated this rule into basic police training. For example, plaintiff's expert refers to California Commission on Peace Officer Standards and Training, Learning Domain Sixteen, Search and Seizure. The California Basic Training Learning Domain document counsels: "Peace officers may *detain* and pat down persons who are present and have demonstrated a connection with the premises. Examples of such a connection include a person who is already inside the premises, [or who] has a key to enter the premises freely."

m.    Several purposes are served by detaining residents. First, detention prevents a suspect from fleeing before officers discover the contraband. Fleeing generally results in pursuit and perhaps injury. Use of a police service dog is often prescribed to apprehend the fleeing person. Such a contingency may result in injury to the fleeing person. Second, detention enhances safety for the officers and the residents. Effectively detaining and securing persons minimizes the chances of sudden, violent efforts to obtain a weapon to harm oneself or officers, or to attempt to damage or destroy evidence. Third, detention often expedites a search by reducing the interference and potentially freeing officers to assist in searching instead of watching unrestrained persons. Officers are trained not to conduct on-scene risk assessments of potential for personal violence, but are trained to presume that all persons present are potentially violent and to respond to them accordingly. Seemingly timid persons may suddenly become very agitated, violent and threatening. Even persons who know that their crime is minor, such as possession of

drug paraphernalia or small quantities of drugs, can become very combative. Universal police procedure dictates that the persons remain detained and secured for the duration of the search. This principle has recently been reinforced in police in-service training following the Supreme Court decision in *Muehler v. Mena*, 544 U.S. 93 (2005). I have recently noted several police magazine articles, including an article in *Police* (the most prominent law enforcement monthly magazine), quoting the Court's direction that an officer's authority to detain incident to a search warrant is categorical; it does not depend on the quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure. Among those articles discussing *Muehler v. Mena* was an update prepared for Salt Lake County law enforcement officers by the Salt Lake County District Attorney's Office and sent to officers throughout the county.

n. Independent of the general practice of detaining residents found at the location where a search warrant is being executed, several factors present at the execution of the search warrant in this case mandated detention of plaintiffs to accomplish careful investigation of plaintiffs' actual and potential criminal activities. If officers had found conclusive and reliable evidence of entirely separate and independent dwellings immediately upon entering plaintiffs' garage dwelling, no search should have occurred beyond a possible search of the immediate area incident to a probable arrest of plaintiffs on drug and paraphernalia possession charges. However, such evidence was not apparent to the officers at the time.

o. As several of the officers involved in execution of the search warrant noted, it is common for drug dealers and clandestine laboratory operators to conduct business and extend their

residence into a variety of outbuildings. Barnett Depo. 2004 p. 58 ("When I work drug houses, especially big houses, people sleep everywhere"); Fuhr Depo. 2006 p. 89 ("A lot of times we go into those separate garages and things like that that have those facilities are cooking meth. I've done a lot of meth raids where they usually cook or store the drugs there. That's where they make it or operate out of"); Moren Depo. 2006 p. 29 ("We've had them as it's a place where they use as a stash house . . . We've had labs, meth labs, in outbuildings, stash houses, a place where they, you know, secret all their stuff and kind of try and separate it from the house"); Bernards-Goodman Depo. p. 20 ("when somebody has a residence in which drug activity is happening, typically they're storing their drugs all over and they're going to retrieve them and they're having people meet them to retrieve them back at the shed. I've had houses where they're dealing out of the house and there's a lab in the shed or the garage"). This is consistent with my experience. Moreover, the persons in the various buildings at 44 West 2700 South shared access to the unfinished portion of the garage dwelling. Harman Depo. p. 17.

p.  The notion that the garage dwelling was an extension of the main house is bolstered by the appearance and condition of the garage dwelling. At first inspection, this did not appear to the officers to be a separate residence. My visit to the premises and examination of the photographs supports my conclusion that the officers' impressions were reasonable. The exterior does not suggest an independent dwelling. Though there were two mailboxes at the front of the main dwelling, this is hardly an indication of an independent dwelling in the rear. Many homes in Utah (and other places) have two mailboxes. Kotter Depo. p. 22. One of those at 44 West 2700 South was used for

newspapers. Overton Depo. p. 33. There were no separate address identifying numbers or signs. Harman Depo. p. 21; Pollock Depo. 2006 p. 69. Officers were surprised to find the garage occupied by sleeping persons. Barnett Depo. 2006 p. 51.

q. The character and condition of the garage dwelling premises was more consistent with a "crash pad" or transient or temporary use sleeping area that would be an adjunct to the main dwelling, rather than an entirely independent dwelling. The condition was described as in poor condition, with the sink being filled with garbage and the floor littered with dog feces. Marshall Declaration ¶ 6. I have seen such conditions. My consistent experience has been that the occupants of crash pads in such condition are involved in drug use, generally heavy drug use. Other officers confirmed living conditions that contraindicated a regular, full-time, independent residence. Christensen Declaration ¶ 5 ("filthy with clothes everywhere and dog feces on the floor"); Pollock Depo. 2006 p. 69 ("conditions didn't look like what I would consider liveable . . . feces on the floor . . . the sink was filled with [something that looked] like tomato soup, a thick substance . . . no second gas bills, second electric bills"); Pollock Depo. 2006 p. 37 ("quite a bit of dog feces on the floor and it smelled of marijuana"); Fuhr Depo. 2004 p. 55 ("I find it really hard to believe that people could live in there with the kitchen the way it was, because from the stench and also from all the stuff all over the counters"); Moran Depo. 37 ("it didn't look inhabitable at all, as dirty as the thing was . . . you run into some weird stuff, but I don't know how anybody could have lived in it").

r. Melissa Harman's vehicle had been observed parked at the premises. Her name was on the gas service account. The vehicle bore New Mexico license plates. Though the

connection, or lack thereof, between Harman and Isabell or Pawoo was not known prior to the execution of the search warrant, the New Mexico license plate connection was notable. New Mexico is the state with the nation's highest percentage of Hispanic population; nearly one-half of the state is Hispanic. Investigators had apparent reason to assume that there was a connection between Harman, a New Mexico migrant, and the Hispanic persons known to reside at 44 West 2700 South.

s.   A further independent basis for detaining plaintiffs were the crimes discovered in the course of executing the search warrant. Upon entry into the garage dwelling, officers smelled marijuana and saw marijuana and drug paraphernalia in plain sight on the counter top. Fuhr Depo. 2006 p. 57; Marshall Declaration ¶ 11; Maycock Declaration ¶ 5. Officers are taught that contraband may be seized as in plain view when: first, the seizing officer is lawfully present and lawfully able to access the item without violating the Fourth Amendment. If an officer is present in a location serving an arrest or search warrant, the officer is not violating the Fourth Amendment. Second, the item must be in "plain view." Third, the incriminating nature of the item is immediately apparent. Evidence is "clearly incriminating" if the officer has probable cause to associate the item with criminal activity. Though plaintiffs were not consuming the marijuana at the moment the officers entered, a number of factors commonly taught to officers supported a conclusion of plaintiffs' constructive possession of the marijuana and paraphernalia and authorized a custodial arrest for these criminal acts. The factors included, but are not limited to, plaintiffs being apparently voluntarily present where drugs are in open use, plaintiffs' presence at the location where the contraband was found, and plaintiffs' near

proximity to the contraband. Plaintiffs later claimed joint ownership and possession of the marijuana and paraphernalia. Harman Depo. p. 43; Barnett Declaration ¶ 36.

t.    Though the time required to investigate and issue citations to two persons for two misdemeanor drug possession crimes is generally less than the total time of plaintiffs' detention, the detention was reasonable under the circumstances. Not unlike a bar fight or a disturbance in a large dance crowd, sorting out the various pieces of evidence, degrees of involvement and culpability, and even identities of persons found during the execution of a search warrant takes time and must happen in some deliberate fashion. Language barriers and the lack of identification or intelligence information about the residents compounds the challenge. In this case, there were language communications challenges, and general uncertainty about who really lived at 44 West 2700 South. It would have been unwise and even potentially dangerous to reach quick, unsupported conclusions about the limits of plaintiffs' criminal activities. It was reasonable to detain plaintiffs for sufficient time for the on-scene SBI investigators to question all persons in an orderly fashion and to garner whatever information possible from Pawoo, Isabell and their associates concerning their connection (or lack thereof) with plaintiffs. It was reasonable to limit this investigative responsibility to one or two investigators who could confer and collaborate quickly. The total time period of plaintiffs' detention was a reasonable incident of investigating the possession of marijuana and paraphernalia, particularly when these offenses frequently lead to custodial incarceration, inmate intake processing at the county jail, and detention until bond is posted or judicial release or alternative release may be negotiated.

u.    Widely applied police procedures dictate a general organization to the steps of executing a search warrant. Immediately after entry, officers secure the scene, and make an initial sweep and search for safety and security purposes. Next follows the detailed search of the premises to find the subject contraband named in the warrant. In this case, it was good police practice to make the removal from the scene and transportation to a safe place of the children a priority over any interviews. Finally, officers interview persons at the target location who may be involved with the criminal activity under investigation or other crimes that are discovered in the course of the search warrant execution. It is axiomatic that investigators should know as much as possible about the subject of the investigation prior to the interview of any suspect. This allows the investigator to shape the focus of the questioning and to identify deceptive answers from the suspect. In the instant case, it would have been unreasonable for investigators to interview plaintiffs until after a search of the entire premises. In addition to controlled substances and other contraband investigators should have been alert to indicia of a personal or business relationship between plaintiffs and the residents of the main dwelling, such as correspondence, bills addressed to plaintiffs but located inside the main dwelling and in particular the gas bill under Melissa Harman's name, buy/sell sheets with plaintiffs names or the names of the residents of the main dwelling, etc. Investigators also searched for items or documents that implicated Pawoo and Isabell in being potential suppliers of marijuana to plaintiffs, or that implicated plaintiffs in trafficking in heroin and/or cocaine, or that exculpated any of the parties from such crimes.

v.     Pollock searched plaintiffs' garage dwelling as part of his search of the entire premises at 44 West 2700 South. Pollock's search was a reasonable act in execution of a valid search warrant. The circumstances known to the officers at the time of the search warrant execution as described above, particularly those stated in paragraphs f and n through r, inclusive, would not persuade a reasonable officer that there were two entirely distinct and independent dwellings, occupied by persons not connected to one another, at 44 West 2700 South. A reasonable officer would have searched the garage dwelling in the ordinary course of execution of the search warrant, based on the information known to the officers executing the warrant.

w.     Assuming the validity of the entry into plaintiffs' dwelling, a search of the tiny living space would have been virtually inevitable. The strong odor of marijuana, coupled with the marijuana and glass pipe in plain sight, would lead a reasonable officer to detain and likely arrest or perhaps issue a summons to the persons in constructive possession of the illegal drugs and drug paraphernalia. The search here preceded the citation and summons for the criminal charges. However, officers are taught that a search conducted under the *Chimel* rule, or search incident to arrest doctrine articulated in *Chimel v. California*, 395 U.S. 752 (1969), need not always follow a formal arrest. The search may actually precede the arrest as long as the officer has probable cause to arrest at the time of the search and the evidence found is not the sole basis for the arrest. Nor is it critical that actual incarceration in a detention facility result. Officers are taught that courts have approved searches incident to arrest when the suspect is released on a misdemeanor citation, when the citation and release does not precede the search. Given the size and

openness of the dwelling area in this case, the proper scope of a search incident to arrest for the possession of the drugs found on the counter toward the center of the room certainly would include the entire room. Pollock's search was limited to just that scope.

These observations and opinions are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the full accuracy of the pleadings, documents, statements, depositions, diagrams, photographs, and reports, excepting those expressed as opinions or unproved allegations, provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any further report submitted by plaintiff's expert or experts, and further investigation.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected onto a screen charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

Judge Peuler issued a valid search warrant supported by sufficient probable cause based on the best information derived from a reasonable investigation. It was reasonable for the SERT and SBI officers to rely upon the warrant and serve it. The scope of the search and the plaintiffs' detentions incidental thereto and incidental to plaintiffs' illegal drug and paraphernalia possession were reasonable and consistent with generally accepted police practices.

Kenneth R. Wallentine
March 15, 2007

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123