## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| MELISSA HARMAN and JUSTIN OVERTON,<br><br>          **Plaintiffs,**<br>**vs.**<br><br>BRENT POLLOCK, SCOTT BARNETT and JOHN AND JANE DOES 1-15,<br><br>          **Defendants.** | **MEMORANDUM DECISION AND ORDER**<br><br><br>**Case No.  2:03CV558 DAK** |

This matter is before the court on (1) Plaintiffs' Motion for Partial Summary Judgment on Liability,  (2) Defendants' Cross-Motion for Summary Judgment, and (3) Plaintiffs' Motion to Amend the Complaint.[1]  A hearing on the motions was held on August 30, 2007.  At the hearing, Plaintiffs Melissa Harman and Justin Overton were represented by Robert B. Sykes.   Defendants Brent Pollock and Scott Barnett were represented by Matthew D. Bates.   Before the hearing, the court considered carefully the memoranda and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to the motions.   The court has also considered the following papers, which were filed after the August 30, 2007 hearing on the motions: Plaintiffs' Supplemental Memorandum in Support of Motion to Amend the Complaint, Defendants' Supplemental Memorandum in Opposition to the

---

[1]  Plaintiffs seek to name an additional Defendant in this case.   The court denies this motion because the four-year statute of limitations has run.  *See Sheets v. Salt Lake County*, 45 F.3d 1383, 1387 (10th Cir. 1995).

Motion to Amend Complaint, Defendants' Notice of Supplemental Authority, and Plaintiffs' Response Re: Notice of Supplemental Authority.  Now being fully advised, the court renders the following Memorandum Decision and Order.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56c.  In reviewing the factual record, the court construes all facts and makes reasonable inferences in the light most favorable to the non-moving party.  *See Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir.1998).

In cases such as this, where a defendant invokes a qualified immunity defense, "the plaintiff bears the burden of satisfying a strict two-part test."  *Camfield v. City of Okl.,* 248 F.2d 1214, 1225 (10th Cir. 2001).  "First, the plaintiff must demonstrate that the defendant's actions violated a constitutional or statutory right.  Second, the plaintiff must show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue."  *Id.* at 1225-26  (internal quotations and citations omitted); *see also Wilson v. Layne*, 526 U.S. 603, 609 (1999).  Even if a plaintiff's constitutional rights were clearly defined at the time of the alleged violation, a defendant is entitled to qualified immunity if it was objectively reasonable for him to believe that his actions did not violate those rights.  *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986).

## II. BACKGROUND

This case was brought pursuant to 42 U.S.C. § 1983, alleging that Defendants improperly entered and searched Plaintiffs' residence without a warrant and then illegally detained Plaintiffs. Within two months after the Complaint was filed, Defendants filed a Motion for Qualified Immunity and Summary Judgment" on August 21, 2003. Plaintiffs requested a Rule 56(f) continuance to pursue discovery. On January 14, 2004, the Honorable Tena Campbell held oral argument on the Rule 56(f) motion and ultimately permitted Plaintiffs to conduct limited discovery into four narrow issues.[2] The court allowed short depositions (not to exceed 150 minutes) of seven individuals on four specific topics, which dealt primarily with the legality of the entry into the residence and whether there was knowledge of a second residence. The court subsequently permitted two additional people to be deposed.[3] When Plaintiffs filed their Memorandum in Opposition to Defendants' Motion for Summary Judgment, they also filed their own Motion for Summary Judgment. On August 5, 2004, the court heard oral argument on the motions, and on November 9, 2004, the court granted Defendants' Motion for Summary Judgment, finding that the officers were entitled to qualified immunity on all claims asserted by Plaintiffs.[4]

Plaintiffs subsequently appealed the grant of qualified immunity to the Tenth Circuit Court of Appeals. On May 2, 2006, the Tenth Circuit affirmed the court's grant of qualified

---

[2] *See docket ## 23, 24*

[3] *See docket #29*

[4] *See docket #57*

immunity as to Plaintiffs' claim of an unreasonable entry into 44 ½ West 2700 South.   The court

found that the initial entry into the home was an objectively reasonable mistake.   *Harman v.*

*Pollock*, 446 F.3d 1069, 1076 (10th Cir. 2006).   The Tenth Circuit, however, reversed and

remanded the court's grant of qualified immunity to the officers with respect to the Plaintiffs'

claims of an unlawful search and seizure, finding that   "[m]aterial factual disputes exist as to the

reasonableness of the subsequent search and detention of Ms. Harman and Mr. Overton."

*Harman*, 446 F.3d at 1082.   Specifically, the Tenth Circuit concluded that (1) "there are material

facts in dispute as to the reasonableness of the officer's delay in realizing that they were in a

separate residence not anticipated in the warrant"; (2) "there are material facts in dispute as to the

reasonableness of the lengthy detention of the plaintiffs and when the officers' authority

terminated"; and (3) "material facts remain in dispute as to the reasonableness of the detention of

the plaintiffs and search of the garage apartment."[5]  *Id.* at 1085-87.   The Mandate was filed on

May 26, 2006.[6]

On June 23, 2006, Plaintiffs moved for summary judgment on liability.[7]  Plaintiffs

essentially contended that the Tenth Circuit had made factual and legal determinations that

compelled a finding of liability.   Defendants filed a Motion to Strike Plaintiffs' Motion for

Partial Summary Judgment on Liability and an Alternative Rule 56(f) motion, pointing out that

---

[5]  The *Harman* court did not consider the issue of whether Defendants had probable cause to detain and arrest Plaintiffs because "[t]his argument was not raised before or ruled upon by the trial court, and we decline to address it here."  *Id*. at 1089.

[6]  *See docket #67*

[7]  *See docket #76*

the Tenth Circuit had viewed the evidence in a light most favorable to Plaintiffs and that

Plaintiffs had completely failed to address the factually disputed qualified immunity issues that

remained.  Defendants also sought leave to conduct more thorough discovery as to the specific

issues identified by the Tenth Circuit.[8]  On September 26, 2006, the court denied Plaintiffs'

Motion and granted Defendants' motion, permitting the parties to conduct discovery.[9]

On March 19, 2007, Plaintiffs filed a Motion to Amend the Complaint.[10]  On April 13,

2007, they filed a Motion for Partial Summary Judgment on Liability. [11]  Defendants filed a

Cross-Motion for Summary Judgment on May 15, 2007. [12]   Oral argument was held on August

30, 2007, and the court took the motions under advisement.   Supplemental authority was then

filed by both parties.[13]

### III.  FACTS[14]

In mid-2002, the State Bureau of Investigation ("SBI") began investigating illegal drug

---

[8]  *See docket #80*

[9]  *See docket #90*

[10]  *See docket #115*

[11]  *See docket #125*

[12]  *See docket #133*

[13]  *See docket  ##144-147*

[14]  In their memoranda, Plaintiffs purport to dispute many of Defendants' facts.   The court finds that none of the purported disputes, however, is material to the resolution of these motions and/or that Plaintiffs have failed to sufficiently dispute the fact by pointing to contradictory evidence in the record.  In most cases, Plaintiffs dispute is based on semantics or the way in which Defendants' fact was characterized.   When appropriate, the court has restated the facts that Plaintiffs contend were overstated or mischaracterized.

trafficking by two Hispanic individuals known as Isabelle and Pawoo.  Defendant Trooper Brent

Pollock was assigned as the case agent.   Defendant Sergeant Scott Barnett was his immediate

supervisor.  Working under cover, Pollock made contact with Isabelle through a confidential

informant and made several controlled drug buys from Isabelle and Pawoo.   During some of the

drug buys, Isabelle had small children with her.   After the buys, other SBI agents traced Isabelle

to a house at 44 West 2700 South ("44 West") in South Salt Lake City, where she apparently

resided.

Pollock and other SBI agents visited the address and observed a detached garage (the

"rear building") at the back of the property.  After his initial surveillance of the 44 West property,

Pollock asked Joe Gomez, an intelligence analyst for SBI, to investigate ownership of the

property, including utility and county records.   Gomez discovered the following information

about 44 West:

a.      It was owned by James B. Tucker, but Mr. Tucker lived at another address.

b.      Salt Lake County had designated the 44 West parcel for a single family dwelling.

c.      The Questar gas account at 44 West was under the name Melissa Harman.

d.      Two other people had listed 44 West as their address.   Both had violent criminal

histories.

Gomez did not find any evidence of a second residence on the property.   He ran

Harman's name through a subscription credit database and discovered that she had credit activity

in New Mexico.   He then ran her name through New Mexico's drivers license records and

discovered that she had a current New Mexico drivers license with an address in Albuquerque.

Gomez reported all of his findings to Pollock

### The Warrant

In early February 2003, Pollock drafted a no-knock search warrant and affidavit for 44

West.  The warrant described the property to be searched as:

> 44 West 2700 South, South Salt Lake City, Utah, a white house, brown roof, front
>
> door faces south, small wood fence to the west of the door across the front, # 44
>
> on the wall to the right of the front door, a *detached garage* to the rear of the
>
> house on the east side.

(emphasis added).  The warrant authorized the search of the entire property, including "any and

all outbuildings and curtilage of the property."   The warrant described the persons to be searched

as a Hispanic female, Isabelle, and a Hispanic male, Pawoo.  The warrant authorized Defendants

to search for drugs, drug distribution materials, drug paraphernalia, and records or papers

showing residence or control of the premises.   The affidavit attached to the warrant stated that

Melissa Harman had listed 44 West 2700 South as her address.

Barnett assisted Pollock in drafting the warrant and affidavit.  Pollock screened the

warrant with Katie Bernard-Goodman, a Deputy Salt Lake County District Attorney.   Ms.

Goodman told Pollock that the warrant lawfully covered the rear building.  Pollock presented the

warrant and affidavit to Judge Sandra Peuler of the Utah Third District Court, who signed the

warrant on February 4, 2003.  Based on Ms. Goodman's review of the warrant and Judge

Peuler's approval of the warrant, Pollock believed that the warrant was supported by probable

cause and authorized him to search all buildings on the lot located at 44 West 2700 South.[15]

Because Defendants suspected that dangerous individuals were residing on the property, they contacted the Special Emergency Response Team ("SERT") to execute the warrant. SERT is a section within the Utah Highway Patrol that, among other things, serves high-risk warrants. Three SERT officers scouted out the property at 44 West to determine the safest method to enter the buildings. During the reconnaissance, the scout team saw people entering the rear building. They also saw lights and heard voices in that building. The SERT scout team checked with the South Salt Lake City Planner's office and was told that the property at 44 West did not include a second residence. The scout team relayed this information to Pollock.

### Executing the Warrant

At approximately 12:45 a.m. on February 12, 2003, SERT officers simultaneously entered the front and rear buildings at 44 West. SERT officers used a ram to force open the front door of the rear building. Upon entering the rear building, they found Melissa Harman and Justin Overton on a mattress in a bedroom. SERT officers observed marijuana and a pipe in plain view on the kitchen counter. The rear building was furnished with a kitchenette, a bathroom, a couch, a television, and a separate room with a mattress on the floor. SERT officers handcuffed Harman and Overton, escorted them to the couch, and covered them with a sheet or blanket.

---

[15] Throughout their briefing, Plaintiffs have referred to Harman's residence as "44 ½ West," and they have included pictures of the residence with house numbers "44 ½ West." It is undisputed, however, that no such numbers were on the rear residence at the time of obtaining or executing the warrant and that the officers had no indication that a "44 ½ West" address existed at the time of the events at issue.

It took approximately fifteen minutes for SERT to secure the entire property at 44 West, including the rear building.[16]  After the property was secured, Pollock, Barnett, and several other SBI agents arrived to search for evidence and interview the suspects found on the property. Because Pollock had worked undercover during the investigation, he wore a mask over his face and did not interact with any of the suspects found on the property.   He waited on the edge of the property until the suspects, including Harman and Overton, were escorted to the detention van, which was parked in front of the property.

Barnett and the other SBI agents went first to the front building.  They swapped the SERT officers' handcuffs for their own handcuffs and escorted the buildings' occupants to the containment van to await interviewing.  Agent Cori Start, a female SBI agent, went to the rear building and helped Harman get dressed.[17]   She and other SBI agents, including Barnett, then swapped Harman and Overton's handcuffs and escorted them to the containment van.   At some point during this process, the agents learned Harman's and Overton's names and relayed those names to Pollock.

When Pollock learned that Harman had been found in the rear building, he remembered her name as the person on the gas account at 44 West.   He suspected that she was involved in Isabelle and Pawoo's drug trafficking and that she was only temporarily in the rear building when

---

[16]  Plaintiffs dispute this fact as misleading and inaccurate because, they claim, it "could not possibly have taken 15 minutes to secure 'the rear building.'"  The court notes, however, that Plaintiffs have failed to dispute Defendants' statement that it took approximately fifteen minutes to secure *the entire property at 44 West, including the rear building.*

[17]  Plaintiff dispute that it was agent Cori Start who helped Harman get dressed.   The court finds this dispute immaterial.

the search occurred.[18]   After officers took Harman and Overton to the van, Pollock entered the

rear building and seized the marijuana and pipe on the counter.   He also performed a cursory

walk-through of the building to check for other drugs or weapons.   While the other SBI agents

searched the buildings, Barnett interviewed the suspects found in the front and rear buildings.   He

first interviewed Harman and Overton and asked them about the marijuana found in the rear

building and about any association they might have to the people in the front building.

Harman and Overton claimed that they did not know the occupants of the front building

and were not involved in any way with drug trafficking.   Barnett then interviewed the occupants

of the front building, who confirmed that Harman and Overton were not involved in illegal drug

trafficking or otherwise associated with Pawoo and Isabelle   After interviewing all suspects

found on the property, including Harman and Overton, Barnett advised Lieutenant Ed Michaud,

the scene commander, that Harman and Overton did not appear to be involved in the drug

trafficking.   He recommended citing Harman and Overton for the marijuana and pipe found in

the rear building and releasing them.   Only a few minutes lapsed from the time Barnett verified

Plaintiff's story and the time he told Michaud to cite them and release them.[19]   Michaud agreed

---

[18]   Plaintiffs dispute this fact as an overstatement of Pollock's deposition testimony.   The court finds that it is not inconsistent with his testimony.   He testified that when he heard Melissa Harman's name as someone who was found on the property, it "brought it more together" that "maybe she was intertwined with this."   Pollock Depo. of 11/29/06 at 15-16.

[19]   Plaintiffs claim that this is a "gross distortion."   Plaintiffs' disagreement, however, is misplaced because Plaintiffs focus on the time between when their interviews started and when they were released.   They do not have any evidence to create a dispute about the time that elapsed between the time when Barnett verified their story and told Michaud to cite and release them.   To the extent Plaintiffs complain that significant time elapsed between when Michaud cited them and when he released them, the court finds it immaterial because Michaud is not a Defendant in this lawsuit.

with Harman's recommendation, and at 2:35 a.m. he cited Harman and Overton, removed their handcuffs, and released them.  Officers remained on the property at 44 West until approximately 3:30 to finish searching the front building and processing the remaining suspects.

Aside from answering a brief questions about the warrant, neither Pollock nor Barnett had any further interaction with Plaintiffs during the execution of the search warrant.   When Pollock searched the rear building, he believed that building was accessible to and under the control of the occupants of the front building, that Harman and Overton resided in the front building, and that they just in the rear building "partying."  Pollock did not interview or detain Plaintiffs in any way.   When Barnett detained and interviewed Plaintiffs, he suspected that they were involved in drug trafficking and believed they were guilty of possession of marijuana and drug paraphernalia. Barnett never searched the rear building.

Pollock and Barnett did not know that Harman and Overton lived in a separate residence that was unassociated with Isabelle and Pawoo's drug trafficking until Barnett finished interviewing all the suspects on the property.

## IV.  DISCUSSION

Despite the Tenth Circuit's finding that genuine issues of material fact precluded the grant of qualified immunity regarding the search and seizure, both parties contend that after additional discovery, no genuine issues of material fact remain.[20]  Rather, each party contends

---

[20]  The court recognizes that the Tenth Circuit remanded this case based on its determination that there were several disputed facts that precluded the grant of qualified immunity.  By entertaining the instant motions for summary judgment, the court does not mean to disregard the Tenth Circuit's instructions.  The court believes, however, that the Tenth Circuit did not intend to preclude consideration of such motions, given (1) the altered landscape of this case after significant additional discovery was conducted after remand, (2) that both parties agree

that they are entitled to summary judgment.

**A.     POLLOCK AND BARNETT ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEY DID NOT VIOLATE PLAINTIFFS' FOURTH AMENDMENT RIGHTS.**

Pollock and Barnett are entitled to qualified immunity for detaining Plaintiffs.   As

explained below, Barnett did not violate Plaintiffs' Fourth Amendment rights by detaining them,

because he reasonably suspected that Plaintiffs were guilty of possessing a controlled substance

and were linked to the drug dealing suspected at the property.   These suspicions entitled Barnett

to detain Plaintiffs while he pursued a reasonable investigation to confirm or dispel his

suspicions.   Pollock is entitled to qualified immunity because he did not personally participate in

Plaintiffs' detention.

Pollock and Barnett are also entitled to qualified immunity for searching Plaintiffs'

dwelling.  When Pollock searched the rear building, he did so pursuant to a valid warrant.  He

also believed that Plaintiffs were involved in trafficking drugs with Isabelle and Pawoo, and

nothing he found before or during his search dispelled that belief.   Barnett is entitled to qualified

immunity as to the search because he did not personally participate in searching the rear building.

**1.     Pollock and Barnett had reasonable suspicion to detain Plaintiffs because they found Plaintiffs in possession of marijuana and because Plaintiffs had a demonstrable connection to a suspected drug house.**

Plaintiffs assert that Pollock and Barnett unlawfully detained them for "an excessive

---

that no material issues of fact remain, and (3) that new arguments have been developed that were
not addressed on appeal.  Indeed, the Tenth Circuit stated that "[t]he district court may make
further findings on this claim."  *Harman*, 446 F.3d at 1088; *see also id.* at 1089 (noting that
"[t]he district court may make findings and hold additional hearings regarding officers'
alternative arguments concerning the officers' authority to detain the plaintiffs, and the
applicability of the plain view doctrine.")

period of time."   The Tenth Circuit has already determined that the initial entry and seizure of
Plaintiffs by the SERT team was reasonable.   *See Harman v. Pollock*, 446 F.3d 1069, 1080–81
(10th Cir. 2006).   The Tenth Circuit reversed and remanded the case, however, for this court to
determine whether it was reasonable to continue to detain the Plaintiffs.   *Id.* at 1089.   The
undisputed facts demonstrate Pollock had no role in detaining Plaintiffs and that Barnett detained
the Plaintiffs only long enough to investigate his suspicions that Plaintiffs were involved in
criminal activity.   His detention of Plaintiffs was therefore reasonable and did not violate the
Fourth Amendment.

> ### a.   *Plaintiffs' detention was a proper investigatory detention as established by Terry v. Ohio.*

Almost forty years ago, the U.S. Supreme Court held that law enforcement officers may
detain a person on less than probable cause if the officer reasonably suspects that criminal
activity is afoot.   *See Terry v. Ohio*, 392 U. S. 1, 20 (1968).   Such detentions may not be based
on "inarticulate hunches." *Id.* at 22.   But, "the likelihood of criminal activity need not rise to the
level required for probable cause, and it falls considerably short of satisfying a preponderance of
the evidence standard."   *United States v. Arvizu*, 534 U.S. 266, 274 (2002).   In fact, "[a]
determination that reasonable suspicion exists . . . need not rule out the possibility of innocent
conduct." *Id.* at 277.   There need only be articulable facts from which an officer can reasonably
infer that criminal activity "may be afoot."   *Terry*, 392 U.S. at 21, 30.

While *Terry* involved stopping an individual on the street, subsequent cases recognize
that "the exception for limited intrusions . . . is not confined to the momentary, on the street
detention accompanied by a frisk for weapons involved in *Terry* and *Adams*."   *Summers*, 452

U.S. at 700.   Rather, the reasonableness of an investigatory detention is determined by the

character of the intrusion and its justification.   *Id.* at 701.   Courts balance the need for the

detention against the invasion the detention entails.   *Terry*, 392 U.S. at 21.   In balancing the

interests of law enforcement and the detainee, the court weighs the facts against an objective

standard.   *Id.* at 21–22.   An action is reasonable under the Fourth Amendment, regardless of the

individual officer's state of mind, "as long as the circumstances, viewed *objectively,* justify that

action."   *Scott v. United States,* 436 U.S. 128, 138 (1978).   Thus, the proper inquiry is:  "would

the facts available to the officer at the moment of the seizure or search 'warrant a man of

reasonable caution in the belief' that the action taken was appropriate?'"  *Id.* at 21–22 (quoting

*Carroll v. United States*, 267 U.S. 132, 162 (1925)).

Because the question of reasonableness is ultimately a balancing of interests, there is no

time limit on an investigatory detention.   *See United States v. Sharpe*, 470 U.S. 675, 685 (1985)

(stating that "our cases impose no rigid time limitations on *Terry* stops").   Rather, courts must

consider the law enforcement purposes served by the detention and the time reasonably needed to

effectuate those purposes.   *Id.*  So long as officers are "diligently pursuing a means of

investigation that [is] likely to confirm or dispel their suspicions quickly," a detention is

reasonable.   *Id.* at 686.   Additionally, the court should avoid "unrealistic second guessing."  *Id.*

Officers unraveling facts in a swiftly developing situation may mistakenly choose the less-

efficient of two alternative means of investigating the situation.   But, their mistake does not

render the detention unreasonable.   *Id.* "The question is not simply whether some other

alternative was available, but whether the police acted unreasonably in failing to recognize or

pursue it." *Id.*

In this case, Barnett's detention of Plaintiffs was a justifiable investigatory detention.  It was supported by reasonable suspicions of criminal activity, and it lasted no longer than was necessary to confirm or dispel those suspicions.

> **b.      Barnett reasonably suspected that Plaintiffs were involved in criminal activity and detained them no longer than was necessary to dispel his suspicions.**

An objectively reasonable officer would have significant suspicion that Plaintiffs were engaged in criminal activity.  First, Pollock and Barnett suspected that the rear building was being used by the occupants of the front building as a place to store and use drugs.   Pollock had purchased drugs undercover from two Hispanic suspects living in the front building.   He knew that those suspects had children.   Three SERT officers, during their reconnaissance of the property, had seen lights and heard voices in the rear building.   Those officers learned from South Salt Lake City, however, that the property was only zoned for one single family residence. With such facts, an objectively reasonable officer would connect the dots and suspect that the drug dealers resided in the front building and were using the rear building to store or use drugs away from the children.

Barnett's discoveries when he entered the rear building would confirm the suspicion of any reasonable officer that the rear building was a crash pad and that its occupants were associated with the suspects in the front building.   He found marijuana and a pipe in plain view on the counter.  Barnett also found Melissa Harman—one of the suspected residents of 44 West and the person responsible for the gas bill at the front building.

From these facts, an objectively reasonable officer could conclude that Harman resided in

15

the front building, and was temporarily in the rear building to party and use drugs with Overton. A reasonable officer could further conclude that Harman was involved in drug trafficking with the Hispanic subjects of the warrant because she had ties to New Mexico. New Mexico has a high Hispanic population and is a border state through which drugs from Mexico might pass. Considering the totality of the circumstances, a reasonable officer would at least suspect that Harman was involved in illegal drug activity with the Hispanic suspects.

Given these suspicions, Plaintiffs' detention was reasonable. Barnett detained Plaintiffs only long enough to investigate their possession of drugs, their association with the other suspects, and their possible involvement in drug trafficking. This included interviewing the Plaintiffs, searching the premises for controlled substances and other evidence of drug trafficking, and checking their story against information from other suspects on the premises.

Once Barnett had confirmed Plaintiffs' story, he advised Lieutenant Michaud of his findings, and Michaud cited and released Plaintiffs. Barnett's questioning constitutes diligent pursuit of "a means of investigation that was likely to confirm or dispel [his] suspicions quickly." *Sharpe*, 470 U.S. at 686; *see also Summers*, 452 U.S. at 700 n.12 (noting that the most common investigative tool during a *Terry* stop is to interrogate the suspect and further noting that an officer may "communicate with others . . . in an effort to verify the explanation tendered").

A prudent officer would not simply take Plaintiffs' claims of innocence at face value and release them without further investigation. *See Hill v. California*, 401 U.S. 797, 802 (1971) (upholding arrest of suspect despite his protestations to police that he was not the suspect they were looking for). If Plaintiffs had been lying and were, in fact, involved in drug trafficking,

16

releasing them would allow them to flee, destroy evidence, or possibly react violently. *See Summers*, 452 U.S. at 702–03. "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence." *Id.* at 702. "The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation." *Id.* at 703.

Inasmuch as Barnett had a ready means of confirming Plaintiffs' claims—questioning the other suspects—it was reasonable to keep Plaintiffs secure until he could verify their story. While this may have inconvenienced, humiliated, and embarrassed Plaintiffs, it was justified by Barnett's need to maintain control of the scene until he could be sure that Plaintiffs were not involved in illegal drug trafficking. Such are "the inconveniences we all expose ourselves to as the cost of living in a safe society." *Illinois v. Rodriguez*, 497 U.S. 177, 184 (1990).

Additionally, independent of the warrant, Defendants had reasonable suspicion to detain Plaintiffs. Plaintiffs were caught with drugs and drug paraphernalia, and they had an articulable connection to Isabelle and Pawoo's drug trafficking. Thus, under *Terry* and its progeny, Defendants had reasonable suspicion to detain Plaintiffs while Barnett interviewed everybody found on the property. Plaintiffs' detention is particularly reasonable in light of the fact that Barnett could have arrested them and booked them into jail for possession of marijuana and paraphernalia. Under *Atwater v. City of Lago Vista*, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." 532 U.S. 318, 354 (2001). Barnett chose, however, the less intrusive alternative: detaining Plaintiffs at the scene only long

enough to question them and verify their story and then releasing them with a citation.

Accordingly, the court finds that Plaintiffs' detention was reasonable and that Barnett did not violate their Fourth Amendment rights.

### c. There is no evidence that Pollock participated in detaining Plaintiffs.

Pollock is not liable for any violation of Plaintiffs' rights relating to their detention because he did not personally participate in the detention.   To be liable under § 1983, each defendant must have personally participated in causing the Plaintiffs' injuries.  *See Stidham v. Peace Officer's Standards & Training*, 265 F.3d 1144, 1156–57 (10th Cir. 2001).  Plaintiffs may not rest Section 1983 claims on principles of *respondeat superior*; rather, they must prove an affirmative causal link between the defendant's conduct and the violation.  *See id.*  "The plaintiff must show the defendant personally participated in the alleged violation . . . ." *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996).  "[I]t is not enough for a plaintiff to show a defendant was in charge of other state actors who actually committed the violation." *Id.*  Rather, "plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional rights." *Id.* at 994–95.

In this case, Pollock did not authorize or otherwise participate in Plaintiffs' detention. Pollock never even spoke with or interacted with Plaintiffs.  Instead, Sergeant Barnett took custody of Plaintiffs, interviewed them, and then recommend to the scene commander to release them with a citation.  The instant case is similar to *Martinez v. Carr*, 479 F.3d 1292, 1295 (10th Cir. 2007).  Martinez was detained under questionable authority by police at the state fair.  *Id.* at 1293.  He later sued Carr, whose only involvement in the detention was to issue Martinez a

citation and release him. *Id.* at 1293–94.  In reviewing a denial of qualified immunity, the Tenth

Circuit noted that Carr had not confronted, stopped, or seized Martinez in any way. *Id.* at 1295.

The court held that merely issuing a citation did not constitute a seizure under the Fourth

Amendment and granted Carr qualified immunity.  *Id.* at 1299.  Similarly, Pollock did not

confront, stop, or seize Plaintiffs in any fashion.   In fact, Plaintiffs admit that they had never

seen Pollock before their depositions in this case.  Pollock is entitled to qualified immunity

because he did not personally participate in Plaintiffs' detention.  *See Martinez*, 479 F.3d at

1299.

> **2.      Pollock and Barnett had probable cause and a valid warrant to search Plaintiffs' dwelling.**

Plaintiffs assert that Defendants violated their Fourth Amendment rights by searching the

rear building without probable cause and without a valid warrant.   The Tenth Circuit has already

ruled that officers lawfully entered the rear building pursuant to a valid warrant. *See Harman*,

446 F.3d at 1080–81.  On remand this court must determine what searches occurred after the

initial entry and whether those searches were lawful.  *Id.* at 1089.

Discovery conducted after Plaintiffs' appeal resolved the question of whether a search

occurred after the initial entry.   Once Barnett escorted Plaintiffs to the containment van, Pollock

entered the rear building and seized the marijuana and pipe.   He also performed a cursory walk-

through of the building to check for other drugs or weapons.  This court must now determine

whether Pollock's search was lawful.

The court finds that Pollock did not violate Plaintiffs' Fourth Amendment rights when he

searched the rear building because he had a valid warrant supported by probable cause.   Finding

drugs and Melissa Harman in the rear building added to probable cause.

> ### a.   Officers may rely on a warrant so long as they reasonably believe the warrant is supported by probable cause.

Police do not offend the Fourth Amendment when they reasonably rely on a facially valid warrant. *See United States v. Leon*, 468 U.S. 897, 919–21 (1984); *Massachusetts v. Sheppard*, 468 U.S. 981, 989–90 (1984). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." *Leon*, 468 U.S. at 921.  Just as an officer must accept a magistrate's determination that a warrant form is invalid, an officer may rely on a magistrate's approval of a warrant. *Sheppard*, 468 U.S. at 990.

An officer's right to rely on a valid warrant is not, however, absolute.   The United States Supreme Court recognized in *Leon* that "the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant must be objectively reasonable." *Leon*, 468 U.S. at 922.   A few federal circuit courts have addressed the question of whether officers reasonably relied on a magistrate's probable cause determination after discovering new facts that altered the probable cause analysis. *See United State v. Perez*, No. 06-50041, 2007 WL 1065784 (5th Cir. April 11, 2007); *United States v. Bowling*, 900 F.2d 926, 932 (6th Cir. 1990); *United States v. Marin-Buitrago*, 734 F.2d 889, 894–96 (2d Cir. 1984). These courts have held that officers may continue with the search so long as the new facts do not dispel probable cause. *See Perez*, 2007 WL 1065784, at *5–7 (holding that discovery during search that multiple people had access to Perez's computer did not dispel probable cause to believe that Perez was person responsible for child pornography on computer); *Bowling*, 900 F.2d at 934 (holding that fruitless

consent search performed while officers were seeking warrant did not dispel probable cause basis

for warrant because search was cursory and did not cover all areas authorized by warrant);

*Marin-Buitrago*, 734 F.2d at 895 (holding that claims by suspect that he was not the person

officers were looking for did not dispel probable cause to search his apartment).   If, however, the

new facts completely dispel probable cause, officers may not begin or continue their search.   *See*

*Maryland v. Garrison*, 480 U.S. 79, 87 (1987) (holding that officers properly discontinued search

when they discovered that third floor apartment they were  searching was, in fact, two separate

apartments and that suspect had no access or control over second apartment).

In this case, Pollock and Barnett found that people they believed to be residents of the

front building were partying and using drugs in the rear building.  As explained below, these new

facts supported the warrant and the underlying probable cause determination. Pollock thus

properly searched the rear building pursuant to the authority granted by the search warrant.   This

case is unlike *Garrison* in that the undisputed facts demonstrate that it did not become clear that

the officers were in a residence that was not anticipated by the warrant until after the search of

the rear building and the front building and the questioning of all people found on the premises.

> **b.      *Probable cause is common-sense, practical determination that there is a fair probability that evidence of a crime will be found in a particular place.***

Probable cause is present when the totality of the circumstances suggest a fair probability

that evidence of a crime will be found in a particular place.   *Illinois v. Gates*, 462 U.S. 213, 230,

234-38 (1983).   In *Gates*, the Court held that **"**[t]he task of the issuing magistrate is simply to

make a practical, common-sense decision whether, given all the circumstances set forth in the

affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.**" *Id.* at 238 (emphasis added).   The Court explained that in dealing with probable cause, courts simply deal with probabilities—"'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id*. at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

The facts supporting probable cause need not rule out innocent explanations.   *Id.* at 244 n.13.   Innocent behavior frequently will provide the basis for a showing of probable cause.   *Id.* "In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Id.*

### c.  Pollock had probable cause to search the rear building.

Pollock had probable cause to search the rear building. He suspected that Isabelle and Pawoo were using the rear building to store and use drugs outside the presence of their children. He also suspected that Melissa Harman might somehow be involved in Isabelle and Pawoo's drug trafficking because she was listed as a resident of the property, had set up the Questar gas account at their home, and was paying the gas bill.   When Pollock learned that officers had found Melissa Harman in possession of drugs and asleep in the rear building, it confirmed his suspicions that the rear building was being used as a crash pad to store and use drugs.   He did not learn that Harman and Overton had no connection to Isabelle and Pawoo until after Barnett had interviewed Harman and Overton and verified their story with the occupants of the front building.   But that did not occur until after Pollock had already searched the rear building.

22

The mere discovery of indicia of dwelling in the rear building did not, in this case, dispel probable cause.   Pollock and Barnett knew that South Salt Lake City had designated the property at 44 West as a single-family dwelling.   There was no separate numbering or lettering on the rear building to indicate that the rear building was a separate residence.   The warrant listed the "detached garage" in the description of the place to be searched, and it authorized the search of "any and all outbuildings and curtilage of the property."   A converted garage used by the front building occupants to store and use drugs fit precisely the warrants description of the property to be searched.

Pollock and Barnett also knew that drug users and traffickers commonly use an outbuilding, separate from their main residence, to store, use, and manufacture drugs.   These buildings commonly contain sinks, stoves, beds or cots, personal items, etc.   Were a magistrate to reevaluate the warrant with the information Pollock had at the time he performed his search, the magistrate would approve the warrant to search the rear building.   *See Marin-Buitrago*, 734 F.2d at 895.   Harman's presence in the rear building suggested that the residents of the front building had access to and control over the rear building.   Moreover, drugs, the very object Pollock and Barnett were seeking with the warrant, were found in the rear building.   The rear building thus appeared to be a crash pad for the occupants of the front building.  The indicia of a dwelling did not so thoroughly disprove this idea as to dispel probable cause, and a reasonable officer would believe that the warrant was still supported by probable cause and would search the rear building.

### d.     *Pollock's search of the rear building was justified by exigent circumstances.*

Pollock's search was also justified under the exigent circumstances exception to the warrant requirement.   In most cases, a search performed without a warrant is unreasonable.  *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001).   Warrantless searches are permissible, however, upon a showing of special law enforcement needs, i.e. exigent circumstances.  *Id.* at 330; *Terry*, 392 U.S. at 20.   One well-settled circumstance in which exigency exists is when officers reasonably believe that the delay necessary to obtain a warrant will risk the destruction of evidence of a crime.  *See Schmerber v. California*, 384 U.S. 757, 770 (1966); *State v. Ashe*, 745 P.2d 1255, 1258 (Utah 1987).

In this case, when Pollock and Barnett entered the rear building, they immediately developed probable cause to search the building. In plain view they found drugs and a person, Melissa Harman, who was connected to a known drug house.   A reasonable officer would believe that a further search of the rear building might uncover drugs, paraphernalia, evidence of drug trafficking, such as ledgers, notebooks, scales, etc., and evidence linking Plaintiffs to the front building, such as utility bills or property records.

Because Plaintiffs already knew that police were aware of their drug involvement, exigent circumstances justified a warrantless search.  Had Pollock and Barnett released Plaintiffs and sought a warrant to search the rear building, any evidence could have been destroyed by the suspects.

### e. There is no evidence that Barnett searched the rear building.

Barnett is entitled to qualified immunity from Plaintiffs' claims that he unlawfully

24

searched the rear building because Barnett did not search that building.  As explained above, a

government actor is only liable for violating a person's rights under § 1983 if he personally

participates in the violation.  Section 1983 plaintiffs may not rely on principles of *respondeat*

*superior* to create liability.  Barnett's role in this case was limited to detaining the occupants of

the property and interviewing them to determine their involvement in drug trafficking.  At no

time did Barnett search the rear building.

**B.      POLLOCK AND BARNETT ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE PLAINTIFFS' CLAIMS ARE NOT GROUNDED IN CLEARLY ESTABLISHED LAW.**

Plaintiffs assert that Pollock and Barnett were put on notice as soon as they entered the

rear building that it was a separate residence that may have been erroneously included in the

warrant.   They conclude from that assertion that the law required  Pollock and Barnett to release

Plaintiffs and retreat from the rear building within two to three minutes of entering the rear

building.   As explained below, Pollock and Barnett are entitled to qualified immunity from

Plaintiffs claims because Plaintiffs' theories of liability are not clearly established law.

**1.      Police officers are entitled to qualified immunity from claims that are not grounded in clearly established law.**

As noted above, Defendants Barnett and Pollock detained Plaintiffs and searched the rear

building consistent with the information available at the time and in furtherance of a valid

warrant.  Accordingly, there has been no violation of Plaintiff's rights under the Fourth

Amendment.   Each of the Defendants is therefore entitled to qualified immunity and the claims

against him should be dismissed as a matter of law.

But even if Plaintiff could show a Fourth Amendment violation, Defendants would each

be entitled to qualified immunity because Plaintiffs' rights in this situation, as articulated in the law, were not so clearly established so as to put either Defendant on notice that the brief detention and cursory search somehow violated Plaintiff's rights.

Whether Plaintiff's rights were clearly established in February 2003, must be analyzed in the specific context of this case, not as a broad general proposition. The Supreme Court has emphasized that "the right the official is alleged to have violated must have been 'clearly established' in a more particularized and hence more relevant sense: the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson,* 483 U.S. at 640.  In *Saucier*, the Supreme Court noted that "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The Tenth Circuit has held that, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other Courts must have found the law to be as the Plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).   In this case, there are no Tenth Circuit or Supreme Court cases that clearly establish Plaintiffs' theories of liability. Defendant are thus entitled to qualified immunity.

### 2.    No clearly established law prohibited Plaintiffs' detention on reasonable suspicion of criminal activity.

As explained above, the law is clear that officers may detain individuals on suspicion of criminal activity.   *See, e.g. Terry*, 392 U.S. at 20; *Adams v. Williams*, 407 U.S. at 144; *Brignoni-*

*Ponce*, 422 U.S. at 881; *Wardlow*, 528 U.S. at 124-26; *Michigan v. Summers*, 452 U.S. at 704–05.   At least one federal court has applied *Terry* to uphold the detention of a house's occupant after a search of that house pursuant to a warrant was completed.   *See United States v. McEaddy*, 780 F. Supp. 464, 472 (E.D. Mich. 1991) (analyzing detention of occupant under *Terry v. Ohio* where justification for detention under *Michigan v. Summers* had ended).   Under *Terry* and its progeny, Barnett's detention of Plaintiffs was reasonable in light of his suspicions that they were involved in drug trafficking.

Plaintiffs argue, however, that Pollock and Barnett had a duty, under *Maryland v. Garrison*, 480 U.S. 79 (1987), to release them.   Plaintiffs claim that *Garrison* required their immediate release, regardless of any independent suspicion officers had that Plaintiffs were engaged in criminal activity.   The court finds that there was not well-established law that guided Defendants as to how to proceed in these specific circumstances.   First, *Garrison* is inapposite to the detention issue in this case.   In *Garrison*, the Supreme Court decided only whether the *search* of Garrison's apartment was proper.   *Garrison*, 480 U.S. at 86–89.   It did not consider any detentions that may have occurred in conjunction with that search.

Since *Garrison*, circuit courts have considered the legality of occupant detentions in conjunction with an alleged *Garrison* violation.   *See, e.g., Liston v. County of Riverside*, 120 F.3d 965, 977–78 (9th Cir. 1997) (holding that officers' authority to detain occupants of house under *Michigan v. Summers* ended when officers learned that suspects in search warrant had sold house and moved).   Those cases have held, correctly, that when officers discover that they are in an area erroneously included in the warrant, their authority to detain people connected to that

area under the warrant as per *Summers* and *Muehler* is rescinded.  *Id.*

But those cases do not make the law clear in this case.   *Liston* and its companion cases involved circumstances in which the warrant was the only basis for detaining the suspects.  They only considered, therefore, officers' categorical authority to detain under *Summers* and *Muehler*. In this case, Pollock and Barnett did not need to rely on their categorical authority to detain people under *Summers* and *Muehler*.  They had independent reasonable suspicion to hold Plaintiffs based on their possession of marijuana and their possible connection to Isabelle and Pawoo's drug trafficking.   Neither the Tenth Circuit nor the Supreme Court has ever suggested that officers may not detain occupants under *Terry*, even though they might lack clear authority under *Summers* and *Muehler*.   That is, there is no clearly established law to guide officers who discover an unexpected dwelling while executing a valid search warrant but who also find reasonable suspicion independent of the warrant to detain the occupants of the dwelling.   Thus, Pollock and Barnett are entitled to qualified immunity from Plaintiffs' claim of an unlawful detention.

### 3.   No clearly established law prohibited Pollock's search of Plaintiffs' dwelling.

Pollock and Barnett are also entitled to qualified immunity regarding Plaintiffs' claims that they unlawfully searched the rear building because the law is not clearly established. As explained above, when officers discover new facts before or during the execution of a warrant that would affect a magistrate's probable cause determination, they may commence or continue the search, so long as the new facts do not dispel probable cause.  *See United States v. Perez*, No. 06-50041, 2007 WL 1065784 (5th Cir. April 11, 2007); *United States v. Bowling*, 900 F.2d 926,

932 (6th Cir. 1990); *United States v. Marin-Buitrago*, 734 F.2d 889, 894–96 (2d Cir. 1984).

Plaintiffs nevertheless claim that Pollock's search was unlawful under *Maryland v. Garrison*, 480 U.S. 79 (1987).  But *Garrison* did not involve the same facts as were present in this case.   In *Garrison*, Baltimore police officers obtained a warrant to search the third floor apartment of Lawrence McWebb.  *Id.* at 80.  During the search, they discovered that the third floor was in fact two separate apartments, one occupied by McWebb and the other by Garrison. *Id.*   Officers had no reason to suspect that evidence of McWebb's criminal activities would be found in Garrison's apartment.  Thus, they stopped the search and withdrew from Garrison's apartment.  *Id.* at 81.

Unlike the officers in *Garrison*, the officers in this case did not enter the purported garage and conclude with certainty that they were in a building not described in the warrant.   Rather, the officers entered a building that they believed was covered by the warrant and were puzzled to discover  some–but not conclusive–evidence of an entirely separate living area that was not anticipated by the warrant.   In this situation, the officers were not required to simply leave due to the ambiguity surrounding the nature of this living area.  Pollock and Barnett had probable cause to believe that the occupants of the front building had access to and control over the rear building (which was included in the warrant) and were storing and using drugs therein.   Their belief was not diminished by what they found upon entering the rear building; rather, it was strengthened. Specifically, Pollock and Barnett found drugs in the rear building, and they also found Melissa Harman, whom they believed resided in the front building with the Isabelle and Pawoo.   This new information did not contradict their belief that the occupants of the front building were using

and possibly storing drugs in the rear building.  That supports probable cause rather than dispels it.  Given the specific circumstances involved in this case, there was no clearly established law to guide the officers' conduct .

## C.   DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEIR CONDUCT WAS OBJECTIVELY REASONABLE

Even if they technically violated Plaintiffs' Fourth Amendment rights, Defendants are nonetheless entitled to qualified immunity because their actions were objectively reasonable in the circumstances.  At the time that they conducted the search of the rear building and detained Plaintiffs for questioning, Defendants believed that they were acting under the authority of a valid warrant supported by probable cause and that their actions were legal and not a violation of Plaintiffs' rights.

The Supreme Court has recognized that, "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether his actions are legal in those circumstances.  *Saucier* 533 U.S. at 205.  If the officer's mistake is reasonable, the officer is entitled to qualified immunity.  *Id.*  Courts should not find a constitutional violation where officers have reasonable but mistaken beliefs as to the facts establishing probable cause or exigent circumstances.  *Id.* at 206.  But, the court held, "even if a court were to hold that the officers violated the Fourth Amendment by conducting an unreasonable, warrantless search, *Anderson* still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Id.*

Under this prong of the qualified immunity analysis, the actions of Officers Pollock and

Barnett were objectively reasonable, and they are entitled to qualified immunity.   Objective

reasonableness is evaluated based upon the information the officers had when the conduct

occurred.  *Id.* at 207.   At the time of the detention of Plaintiffs and the search of the rear

building, Defendants had a host of information that would lead reasonable officers to conclude

that the search and detention of Plaintiffs was justified.   Officers Pollock and Barnett held a

valid warrant that included "a detached garage to the rear of the house on the east side" and

commanded them to search "the above-named or described… property, including any and all out

buildings and curtilage of the property."   The warrant directed them to search for "controlled

substances "and" paraphernalia and containers used in the measuring, packaging, transportation

use and/or sale of controlled substances."   The warrant had been supported by information

gathered by an intelligence analyst in a prior investigation, had been reviewed by a deputy

District Attorney, and signed by a Third District Judge.

　　　When the search team entered the rear building, they indeed found "controlled

substances" and "paraphernalia" used in drug activity.   They also found Melissa Harman who

was listed as a resident of the premises and the person responsible for certain utilities at the

property.   In short, Defendant officers found exactly what their prior investigation and valid

search warrant led them to expect.

　　　Having found drugs and named persons associated with the suspected drug trafficking at

the property, reasonable officers following the guidance of the Supreme Court in *Terry, Leon,*

*Summers, Mueller* and other cases would act as authorized by the warrant to further the search of

the property and investigate the people found there to determine their involvement in the

suspected drug trafficking or other illegal activity.

If conducting the investigation was constitutionally improper, it was nevertheless reasonable in the circumstances.   The circumstances "revealed" substantial grounds for the officers to have concluded they had legitimate justification under the law for acting as they did, and accordingly, their interpretation of the legality of their action was reasonable.   *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179-1196 (10th Cir. 2001).

Qualified Immunity "shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted."   *Brosseau v. Haugen*, 543 U.S. 194-198 (2004).   At the very worst, Defendant officers misapprehended the legality of their search and detention.   If they indeed made a mistake, that mistake was objectively reasonable.[21]   Accordingly, Defendant officers are entitled to qualified immunity.

## V.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Partial Summary Judgment on Liability [docket # 125] is DENIED.  Defendants' Cross-Motion for Summary Judgment [docket # 133] is GRANTED, and Plaintiffs' claims are DISMISSED.  Plaintiffs' Motion to Amend the Complaint [docket # 115] is DENIED.   The Clerk of Court is directed to close this case.

---

[21]  In *Garrison*, the court recognized that "'[b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.   But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability.'" *Garrison*, 480 U.S. at 87 n.11 (quoting *Brinegard v. United States*, 338 U.S. 160 (1949)).

DATED this 18th day of March, 2008.

BY THE COURT:

DALE A. KIMBALL
United States District Judge